# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHIWA NAHADI, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No.: 1:23-cv-00601 (TSC) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, *et al*., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## <u>MOTION FOR DEFAULT JUDGMENT</u>

Plaintiffs in the above-captioned matter, by and through undersigned counsel, respectfully move the Court to enter Default Judgment against Defendants Islamic Republic of Iran *et al*., commensurate with the liability and damages evidence presented in this Motion and pursuant to the private cause of action in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c). Plaintiff respectfully requests that this Court (1) enter default judgment against Iran, (2) find Iran liable for its extrajudicial killing of Mr. Omer Mahmoudzadeh, (3) find Iran liable for the pain and suffering, loss of solatium, and intentional infliction of emotional distress of Plaintiffs, and (4) award all appropriate compensatory and punitive damages.

This case arises out of the extrajudicial killing of Mr. Omer Mahmoudzadeh a/k/a "Chicho", a U.S. citizen and humanitarian aid worker who was killed in an unlawful drone and missile strike, launched by Defendants, Islamic Republic of Iran ("Iran" or "Iranian regime"), and the Islamic Revolutionary Guard Corps ("IRGC"), against Kurdish refugee camps in Northern Iraq.

On September 28, 2022, Iran's IRGC launched a barrage of ballistic missiles and suicide drones, also known as loitering munitions into Koysinjaq ("Koya") Iraq[1]. The attack struck refugee camps primarily sheltering stateless Kurdish refugees, an elementary school for refugee children, and the headquarters of the Kurdish Democratic Party of Iran ("KDPI") that operates the camps[2]. The attack killed 13 people and injured dozens more, including numerous elementary-aged children, and Mr. Omer Mahmoudzadeh (hereinafter, "Mr. Mahmoudzadeh" or "Chicho"), a humanitarian aid worker and U.S. citizen. *See* Ex. 42, Report at pp. 3, 5, and 26.

Mr. Mahmoudzadeh is survived by his wife, Shiwa Nahadi, and their daughter Tara Mahmoudzadeh, both U.S. citizens and Plaintiffs in this case. This attack against civilians was widely denounced by the international community, including the United States. *See e.g.*, Ex's 19-25 and 28-31.

The United States government has recognized this attack as an incident of international terrorism. *See* Ex. 40, Terrorist Incident Designation List, Highlighted Entry ("Date of Designation: October 27, 2022, Country: Northern Iraq, Date of Incident: September 28, 2022 (on or about), Description: Rocket Attack").[3] *See also*, 18 U.S.C. § 2331(1).[4] Plaintiffs bring this

---

[1] See Ex. 26, Human Rights Watch Report; Ex. 16, IRGC Official Telegram Post Announcing the Killing of KDPI Members; and Ex. 17, Images of the IRGC Ground Force's Powerful Artillery Attack.

[2] See Ex. 3, Declaration of Karim Farkhapur at ¶10 and 12. See also Ex. 29, Statement by the Office of the United Nations High Commissioner for Refugees. See also Ex. 31, Statement by UNICEF. See Ex. 33, Human Rights Watch, World Report: 2023, Events of 2022, Iran, p. 7.

[3] "For an incident to be considered an international act of terrorism for the purposes of ITVERP, the incident must be designated as such by the National Security Division of the Department of Justice." "International Terrorism Expense Reimbursement Program FAQ's: When applying for the International Terrorism Victim Expense Reimbursement Program (ITVERP), how is a designated act of international terrorism defined?" *International Terrorism Victim Expense Reimbursement Program*, DEPARTMENT OF JUSTICE, OFFICE FOR VICTIMS OF CRIME (last accessed April 2, 2024) https://ovc.ojp.gov/program/itverp/faqs#4-0.

[4] "(1) The term "international terrorism" means activities that- (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United

suit under the F.S.I.A. in the hopes of holding Iran accountable for the extrajudicial killing of U.S. Citizen, Mr. Omer Mahmoudzadeh.

Plaintiffs submits that the affidavits and evidence attached hereto, and the arguments set forth in this motion are sufficient to support the entry of default judgment and the damages requested. However, should this Court conclude upon review that further evidence is required, Plaintiff respectfully moves for an evidentiary hearing pursuant to Fed. R. Civ. P. 55(b)(2) and the opportunity to present further evidence in support of their claims.

## I.    PERSONAL JURISDICTION OVER IRAN

Courts have personal jurisdiction over a foreign state when that state has been served in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b); *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 299 (D.C. Cir. 2005) (holding that where the other FSIA requirements are met, "personal jurisdiction follows where proper service has been made under § 1608"); *see also* Fed. R. Civ. P. 4(j)(1) (requiring that foreign states be served in accordance with 28 U.S.C. § 1608).

Service of process on Defendant Iran and its agency the Iranian Ministry of Intelligence and Security was obtained pursuant to 28 U.S.C. § 1608(a)(3) and 28 U.S.C. § 1608(a)(4). Service was first attempted under §1608(a)(3) on April 20, 2023, when the Clerk of Court dispatched one copy of the summons, complaint, and notice of suit with official translation, by

---

States or of any State; (B)appear to be intended- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1).

registered mail to the head of the ministry of foreign affairs. *See* [5] CERTIFICATE OF CLERK. Plaintiffs' Counsel received the package with a "Return to Sender" Notice on April 29, 2023. *See* Ex. 39, Service of Process Package. Plaintiff then requested service by foreign mailing pursuant to 28 U.S.C. §1608(a)(4) by diplomatic note forwarded by the U.S. Department of State to the American Interests Section of the Embassy of Switzerland. *See*, [7] REQUEST from Plaintiffs. Specifically, the U.S. Department of State coordinated with the Swiss government to effect service of the suit papers on Defendant. Because the United States does not maintain diplomatic relations with the government of Iran, the Department of State is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. Service of the documents was completed on October 24, 2023, with answer due on December 23, 2023; The Ministry of Foreign Affairs refused acceptance on the same day. *See* [8] CERTIFICATE OF CLERK (dispatching copies through U.S. Dep't of State) and [9] RETURN OF SERVICE/ AFFIDAVIT ("RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to Islamic Republic of Iran served on 10/24/2023, answer due 12/23/2023"). See Also Ex. 27.

As a result of the above-described service of process, this Court has personal jurisdiction over the Defendants. Plaintiffs filed a Motion Requesting Entry of Default, with affidavits verifying service of process to the Clerk of Court on March 8, 2024. *See*, [10] MOTION for Entry of Default. The Clerk of Court entered a default against Defendant Iran on March 11, 2024. [11] Clerk's ENTRY OF DEFAULT.

## II.   SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. §1605A

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign states. 28

U.S.C. §§ 1330, 1602-1611. Section 1604 of Title 28 provides that foreign states are "immune from the jurisdiction of the courts of the United States except as provided in section 1605-1607 of this chapter." The exception applicable to this case is found in 28 U.S.C. § 1605A(a)(1), which provides that,

> "a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, *extrajudicial killing*, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency" (*emphasis added*).

Furthermore, under 28 U.S.C. § 1605A(2)(A) The court shall hear a claim under this section if –

i.  (I) "The foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section. (Subsection II omitted as it is not relevant to this case.)

ii.  "The claimant or victim was at the time of the act described in paragraph (1) occurred- (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

iii.  "In a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration…"

These requirements for the purposes of this case can be broken down into four separate inquires: (A) Whether Iran was designated as a state sponsor of terrorism at the time of the act occurred and remains so designated; (B) Whether the money damages sought against Iran are for personal injury or death caused by an act of  from extrajudicial killing by an official, employee, or agent of Iran acting within the scope of his or her office, employment or agency, or with Iran's material support; (C), that the victim and claimants were Nationals of the United States at the

time the act of extrajudicial killing occurred; and (D) Whether Plaintiff afforded Iran a reasonable opportunity to arbitrate, although this element is not required in this case because the act in question did not occur in Iran itself, but in Iraq.

Plaintiffs submit that each of these jurisdictional prerequisites has been met in this case: a (A) Iran was designated as a state sponsor of terrorism at the time of the act and remains so designated; (B) the death of Mr. Mahmoudzadeh is a result of an act of extrajudicial killing, through the official and authorized action of Iran's agents, specifically the IRGC; (C) Victim, Mr. Mahmoudzadeh and Plaintiffs, Shiwa Nahadi and Tara Mahmoudzadeh were all U.S. Nationals at the time of the act; and (D) Plaintiffs afforded Iran a reasonable opportunity to arbitrate, despite it not being required when the act in question took place on a third sovereign territory, here, Iraq.

## A.  Iran is a State Sponsor of Terrorism (28 U.S.C. § 1605A(a)(1) and (2)(A)(i)(I))

Iran was formally declared a "state sponsor of terrorism" on January 19, 1984, by Secretary of State George Schultz, in accordance with section 6(j) of the Export Administration Act of 1979, 50 U.S.C. Appx 2405(j). S*ee* 49 FR 2836-02 ("I hereby determine that Iran is a country which has repeatedly provided support for acts of international terrorism."); 22 U.S.C. §2656f(a) ("The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30th of each year, a full and complete report" (the "Country Reports on Terrorism") as to the terrorism-related activities of foreign countries). Iran has been continuously listed by the United States Department of State as a state sponsor of terrorism since January 1984. *See* Ex. 43, U.S. State Department, State Sponsors of Terrorism Designation List. The act at issue for this case occurred on September 28, 2022. The requirement that the foreign state be declared a state sponsor of terrorism pursuant to 28 U.S.C. §1605A(2)(A)(i)(I) is therefore satisfied.

**B. The Death of Omer Mahmoudzadeh resulted from an act of Extrajudicial Killing by Agents of Defendants in the Scope of their Agency.**

**1. Evidentiary Standard**

Any discussion of the available evidence of Iran's responsibility for extrajudicial killing and wrongful death in this case should begin with the applicable evidentiary standards of the FSIA. The statute requires that a claimant "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also*, *Owens v. Republic of Sudan*, 864 F.3d 751, 784-85 (D.C. Cir. 2017) (describing claimants' burden as a "rather modest burden of production to establish the court's jurisdiction"). The Court is also obligated to adjust evidentiary requirements to the particular circumstances of the case. In *Kim v. Democratic People's Republic of Korea*, the Court described the reasoning behind the loosened evidentiary standard under the FSIA's terrorism exception: "With these provisions, Congress aimed to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir 2014); *Owens, supra*, at 787-88 (requiring firsthand evidence under the FSIA would "effectively immunize' the regime from responsibility for its crimes"). Due to the nature of FSIA suits, courts have loosened the evidentiary standard for FSIA cases where firsthand accounts may be difficult or impossible to obtain, as "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation," and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Owens*, *supra*, at 787, quoted in *Warmbier v. Democratic People's Republic of Korea*, 365 F. Supp. 3d 30, 43 (D.D.C. 2017). Accordingly, "[w]ith a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Owens*, *supra*, at 787. Further, "[i]n these circumstances,

requiring that the [plaintiff] prove exactly what happened to the [victim] and when would defeat the Act's very purpose" of "punish[ing] foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Kim*, *supra*, at 1048.

Here, Plaintiffs provide ample evidence showing that the death of Mr. Mahmoudzadeh was a direct result of the ballistic missile and suicide drone attack on Koya, Iraq on September 28, 2022. *See generally* Ex. 10, Death Certificate of Omer Mahmoudzadeh. *See also* Ex. 3, Declaration of Karim Farkhapur at ¶10-11., and Ex. 13 (picture of Mr. Mahmoudzadeh released by IRGC as one of those killed). Plaintiffs also provide ample evidence that Iran and the IRGC were responsible for the attack, including their own official and public statements. *See e.g.*, Ex's 12-18. This is corroborated by various statements of other governments, including the United States, Iraq, and numerous United Nations bodies. *See e.g.*, Ex's 19-25; 28-31. Furthermore, Defendants are in default and have not contended that any of the claims made regarding their responsibility for the attack are inaccurate. *See* [11] Clerk's ENTRY OF DEFAULT.

## 2. The Definition of "Extrajudicial Killing" under the FSIA.

FSIA adopts the definition of "extrajudicial killing" found in the Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1605A(h)(7), stating in pertinent part,

> "[T]he term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."

This statutory definition has been interpreted by the D.C. Circuit as containing three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. As to the second point, "[a] 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden

impulse." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), aff'd, 864 F.3d 751, 431 U.S. App. D.C. 163.)

3. **The Unlawful Missile and Drone Strike by Iran against Kurdish refugee camps that led to the death of Mr. Mahmoudzadeh constitutes "Extrajudicial Killing" under 28 U.S.C. § 1605A(h)(7).**

Here, all three *Owens* elements are met. Firstly, Mr. Mahmoudzadeh was killed in the attack on Koya, Iraq committed by Defendants on September 28, 2022. *See*, Ex. 10, Death Certificate of Omer Mahmoudzadeh. *See also*, Ex. 1-3 Declarations of Shiwa Nahadi at ¶10, Tara Mahmoudzadeh at ¶7-8; Declaration of Karim Farkhapur at ¶11. This killing satisfies the first *Owens* element, requiring that there be "a killing". *Owens v. Republic of Sudan*, 174 F. Supp. 3d at 770.

Secondly, the attack was, on its face, a killing that was deliberated upon. Plaintiffs do not contend that the attack was deliberated to kill Mr. Omer Mahmoudzadeh in particular. Rather, Plaintiff contends that it was launched with the intention to cause the largest amount of death and destruction possible within the time frame. See e.g., Ex's. 12-18. This is indisputable given that it was a four-hour long barrage of ballistic missiles and suicide drones onto an area densely populated with civilians, during a time of day that it would be the most likely to contain the most people. *See* Ex. 3, Declaration of Karim Farkhapur at ¶11-13. *See also* Ex. 42, Report by Air Wars at 1-4. A sovereign nation does not launch this sort of prolonged, coordinated, and targeted attack without careful consideration, and an attack of this nature could not be considered one undertaken on "sudden impulse". *See Owens, supra* at 263.Therefore, the killing was deliberated upon.

Finally, this was an action conducted by a military organization with no military justification or incitement, no order has been published or advertised by Iran and IRGC, and therefore cannot be considered to have been authorized a previous judgment pronounced by a regularly constituted court. *Id*. Based on the above, all the elements for establishing that the death of Mr. Mahmoudzadeh constituted an extrajudicial killing are met.

## C. Plaintiffs are Nationals of the United States
## 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)

INA §101(a)(21) defines the term "national" as "a person owing permanent allegiance to a state." Section 101(a)(22) of the INA provides that the term "national of the United States" includes all U.S. citizens as well as persons who, though not citizens of the United States, owe permanent allegiance to the United States (non-citizen nationals). 8 U.S.C. §§ 1101(a)(21)-(22).

Plaintiffs include the Estate of Mr. Mahmoudzadeh, his wife, Mrs. Shiwa Nahadi, and their daughter, Ms. Tara Mahmoudzadeh. All three plaintiffs are U.S. citizens. Mr. Mahmoudzadeh came to the U.S. from Iran as a refugee in the 1990's and eventually earned his citizenship. He was a citizen at the time of his death. *See*, Ex. 6, Omer Mahmoudzadeh, U.S. Passport. *See also*, Ex. 10, Death Certificate of Omer Mahmoudzadeh ("U.S. Department of State, Report of Death of a U.S. Citizen or U.S. Non-Citizen National Abroad" Listing the Evidence of U.S. Citizenship as "Regular Passport #[omitted] Issued on May 18, 2016). Mrs. Nahadi was admitted into the United States under the U.S. Refugee Admissions Program (USRAP) and became a naturalized U.S. citizen on August 29, 2008. *See*, Ex. 5, Shiwa Nahadi Certificate of Naturalization. *See also*, Ex. 1, Declaration of Plaintiff Shiwa Nahadi at ¶3. Their daughter, Ms. Tara Mahmoudzadeh was born in Virginia on July 17. 2002, and is therefore a U.S. citizen by birth. *See* Ex. 8, Tara Mahmoudzadeh, Birth Certificate. *See also* Ex. 9, Tara

Mahmoudzadeh, U.S. Passport. Based on their U.S. Citizenship, all plaintiffs are considered nationals of the United States.

### D. Plaintiff Afforded Iran an Opportunity to Arbitrate
### (28 U.S.C. § 1605A(a)(2)(A)(iii))

Because the act of extrajudicial killing forming the basis of this action did not occur in the foreign state against which the claim has been brought, Plaintiff is not statutorily required to have offered Iran an opportunity to arbitrate. Nonetheless, Plaintiff offered Iran a reasonable opportunity to arbitrate the claims in this action. 28 U.S.C. §1605A(a)(2)(iii) states that the offer to arbitrate requirement applies "in a case in which the act occurred in the foreign state against which the claim has been brought…" The offer to arbitrate required by the statute "need not precede the filing of the complaint." *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) (holding that an offer to arbitrate made after the filing of the complaint was a reasonable offer); *Hekmati supra.*

On December 6, 2023, counsel for Plaintiff sent an Offer to Arbitrate via certified mail to Iran's ambassador to the United Nations and to the Interests Section of the Islamic Republic of Iran in Washington, DC. The Offer to Arbitrate stated:

> Pursuant to 28 U.S.C. § 1605A(a)(2)(iii), Plaintiffs offer to submit the claims in this action to arbitration in accordance with accepted international rules of arbitration. Defendants may accept this offer to arbitrate within fifty (50) days of receipt of this offer by:
>
> 1. Notifying the undersigned counsel, in writing, of Defendants' acceptance; or
>
> 2. Filing a written acceptance with the Clerk of this Court.
>
> Defendants' failure to comply with the accepted procedures set forth above shall constitute a rejection by the Islamic Republic of Iran of a reasonable opportunity to arbitrate these claims. *See*, Ex. 11, Offer to Arbitrate and Certificate of Service dated December 6, 2023.

This offer to arbitrate fully satisfies the offer to arbitrate requirement under FSIA, though it is not required in this case. *See Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24 (D.D.C. 2003) (finding that service of an offer to arbitrate on the Iranian interest section at the Pakistani embassy in Washington, D.C. is sufficient). Here, the "act" occurred in Iraq, a sovereign nation that is not party to this suit. Iran is the foreign state against which the claim has been brought. This provision therefore does not apply to the circumstances of this case; Plaintiff in abundance of caution and thoroughness, went beyond the requirements in making this offer to arbitrate.

### E.  Timeliness of Plaintiff's Suit (28 U.S.C. § 1605A(b))

Any argument as to the timeliness of a plaintiff's claims under the FSIA should be raised by the defendants rather than by the Court. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 330-331 (D.D.C. 2014) ("the statute of limitations is not a requirement for exercise of subject matter jurisdiction"). Because Defendants are in default, the Court need not consider the timeliness of Plaintiff's arguments as a jurisdictional burden to be met by Plaintiff.

### III.    Liability and Scope of Damages

The FSIA specifically authorizes a private right of action against a foreign state that is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(c).  and provides that the foreign state shall be liable to a United States national or the legal representative of such person for personal injury or death caused by the foreign state's act of extrajudicial killing.[5]

---

[5] Plaintiffs suggest that the common law theory of recovery for the Estate of Omer Mahmoudzadeh most applicable to extrajudicial killing is wrongful death. *See Fuld v. Islamic Republic of Iran*, Case No. 1:20-cv-03492-RCL, at 29 (D.D.C. March 28, 2024) (memorandum opinion) (holding that even when Plaintiffs "do not explicitly set forth a common law theory of recovery for the Estate", "the Court can locate an obvious theory for recovery". The Court further explained that under the wrongful death theory, a decedent's heirs, through the estate can claim "economic damages caused to decedents' estates"). Under the theory of wrongful death, which is a common law tort available to plaintiffs pursuant to § 1605A(c), decedents' estate may

28 U.S.C. § 1605A(c). This subsection extends liability to the foreign state if the extrajudicial killing is committed by an official, employee or agent of the foreign state: "In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." The statute allows the recovery of money damages for a variety of claims, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C § 1605A(c). Plaintiffs seeks recovery for pain and suffering, emotional distress, solatium, and punitive damages. Plaintiff, the Estate of Omer Mahmoudzadeh, seeks recovery for the pain and suffering inflicted on Mr. Mahmoudzadeh during the attack. The emotional damages suffered by the other two Plaintiffs, Ms. Nahadi and Ms. Mahmoudzadeh, are described in the attached Declarations: Shiwa Nahadi and Tara Mahmoudzadeh. *See* Ex. 1, Declaration of Shiwa Nahadi and Ex. 2, Declaration of Tara Mahmoudzadeh.

## A. Estate of Omer Mahmoudzadeh – Pain and Suffering

Estate of the victim of the wrongful death may claim for pain and suffering prior to the time of death. Under the FSIA, injured victims and the estates of deceased victims may recover economic damages, which typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses. 28 U.S.C. § 1605A(c). Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 41. In this case Estate of Omer Mahmoudzadeh, established in Common Wealth of Virginia, has the right to bring this action. Ms. Shiwa Nahadi is the Administrator of the Estate of Omer Mahmoudzadeh and authorized to bring this action on behalf of the Estate. See Ex. 61.

---

seek economic and other forms of compensatory damages. *Id*. at 29. However, the FSIA already provides a mode of recovery for pain and suffering damages for the Estate and all applicable forms of compensatory and punitive damages for the family. Economic damages, including funeral costs, are not present in this case, and therefore Plaintiffs do not see a necessity to request damages under a wrongful death theory, given the bar on double recovery. *See id*.

Mr. Mahmoudzadeh, who was once a Kurdish refugee himself, dedicated his life to aiding Kurdish refugee communities, first in the United States, and from 2018 until his death, in Koya, Iraq, where numerous Kurdish-Iranian refugee camps are located. See Ex. 1, Declaration of Shiwa Nahadi at ¶4-5. Koya, Iraq is in the autonomous Kurdistan region of Iraq where many Kurdish-Iranian refugees reside, along with numerous Kurdish-Iranian political parties, including the KDPI. *See* Ex. 3 Declaration of Karim Farkhapur at ¶5. *See also* Ex. 42 at 2. The KDPI helps to operate the refugee camps in the Koya region. *See* Ex. 3, Declaration of Karim Farkhapur at ¶5. *See also* Ex. 32, "Iran Launches Airstrikes against Kurdish group in Northern Iraq."

Due to the need of humanitarian assistance at the refugee camps in Koya, Mr. Mahmoudzadeh volunteered full-time as a humanitarian aid worker, assisting in the coordination of doctors' appointments between the refugee camps and nearby hospitals. Ex. 3 at ¶18 and 21. He had an office in the KDPI Headquarters building, and the role required that he travel between the refugee camps and the KDPI Headquarters office multiple times throughout the day. *Id*. at ¶11.

As protests surrounding the "Women, Life, Freedom" Movement and the death of Mahsa Amini intensified in the Kurdish areas in Iran in September 2022, the Iranian regime began escalating crackdowns on these regions, and threatening Kurdish populations outside of Iran, particularly in the bordering area of the Kurdistan region of Iraq. *See* Ex. 26. *See* Ex. 32 ("deadly attacks come in response to the KDPI support for ongoing protests over Mahsa Amini death in custody"). *See also* Ex. 33, World Report: 2023 Iran. The Iranian regime began issuing threats and warnings in the days leading up to the strike, advising that all people should clear the area. *See* Ex. 3 at ¶8. However, due to their status, the refugees located in Koya have limited freedom of movement. Ex. 3, at ¶5. *See also* Ex, 44 at ¶8 and ¶30. Because they had nowhere else to go,

and because Iran regularly threatens violence against the refugees and the KDPI, people who help operate the refugee camps stayed and continued their work. *See* Ex. 3 at ¶8.

As declared by the Karim Farkhapur from the KDPI, who was present the days before the attack and on the day of the attack with Mr. Mahmoudzadeh, the KDPI and humanitarian aid volunteers were besieged by threats, with the unsettling hum of drones serving as an ever-present reminder of the imminent peril they faced. *See* Ex. 3 at ¶¶ 9-10. In the weeks leading up to the missile strike, the frequency and number of Iranian drones intensified, instilling a pervasive sense of dread within their community. *Id*. at ¶9.

The morning of September 28, 2022, people at the headquarters and refugee camps noticed that the drones hovering overhead seemed closer to the ground; Mr. Farkhapur took a picture of one drone visible overhead just moments before the attack began. *See* Ex. 3, Photograph no. 18. The attacks began around 10:30 a.m. the morning of September 28, 2022. Ex. 3 at ¶10, Ex. 42 at 1 ("On September 28th, 2022, at around 10:30 am, dozens of Iranian missiles and drone strikes reportedly killed between 13-14 people…").

When the attack started, Mr. Mahmoudzadeh was performing his duties as healthcare coordinator as usual. *See* Ex. 3 at ¶10. Mr. Karim Farkhapur stated that he found Chicho's dead body the day after the attack, when he returned to the Camp. Id. at ¶10. He stated that at the time of the attack when he was leaving the building for shelter, he heard someone screaming out of pain, but due to the dust and smoke he couldn't see the face. The next day, when he returned he found Chicho's dead body at the same place, in the headquarters' backyard. There was no other person found close to Chicho, so he believes with certainty that screams that he heard during the attack was from Chicho. Id.  Also, stated that "[h]is body was seriously damaged, his head was seriously injured, and he has lost both of his legs. As shown in enclosed Picture #9, the backyard was hit by multiple missiles, and Chicho was injured with one, however he survived it, that's

when I heard his screams, then other missiles hit the backyard. When I saw his body, and injuries to his head and legs, I reach to the conclusion that he should have been hit by two or more different missiles. The first one injured him but was not fatal, and then the second one caused serious injury to his skull that killed him.' Id. In addition, the death certificate issued by the U.S. Department of State confirms that Chicho died in Koya on September 28, 2022 and the cause of death was "skull laceration with amputation of both legs due to explosion". *See* Ex. 10. After having suffered in unbearable pain for an unknown amount of time, Mr. Omer Mahmoudzadeh succumbed to his injuries sustained from the IRGC attack on September 22, 2018. *See* Ex. 3 Picture #9.

The injuries he sustained constitute "traumatic amputation". Though there was not a thorough autopsy performed on Mr. Mahmoudzadeh, death resulting from traumatic amputation is statistically caused by major hemorrhage.[6] As elaborated on in the British Journal on Pain, death caused by traumatic amputation of the lower extremities in explosions most often occurs due to blood loss, which can take anywhere from several minutes to a period of hours depending on the injury and person. *See*, Jon Clasper and Ramasamy, Arul, Traumatic Amputations, 7 BRIT. J. PAIN 2, 67, 68 (May 2013) (finding that in instances of traumatic amputations from explosives used in terror attacks ranging from IEDs to anti-personnel land mines, the leading cause of death is hemorrhage). As Mr. Mahmoudzadeh's death certificate confirms, the cause of his death was a "skull laceration and the loss of both legs". Ex. 10. Based on these injuries, and eyewitness accounts of him screaming after the first bomb, it is highly likely that Mr.

---

[6] Hemorrhage is defined as the "an acute loss of blood from a damaged blood vessel[s]." "Hemorrhaging can be either external or internal." "Hemorrhage is a leading cause of potentially preventable death, especially in the acute trauma population." *See*, Anna B. Johnson and Burns, Bracken, "Hemorrhage", NATIONAL LIBRARY OF MEDICINE, Last updated August 8, 2023, https://www.ncbi.nlm.nih.gov/books/NBK542273/.

Mahmoudzadeh was conscious and in severe pain for at least a brief period until the second rocket hit the backyard, or just died due the initial injuries. It is not clear how long he suffered, but he was very likely to have experienced severe pain and have been aware of his impending death before succumbing to his injuries.

### 4. Analysis of Pain and Suffering

In determining whether to award damages for pain and suffering to the estate of a deceased victim, courts have considered a variety of factors, including "the amount of pain experienced, how the plaintiff suffered, the extent of the suffering, its nature and intensity, as well as plaintiff's internal condition perceptible to their senses; noting that the pain and suffering must be conscious. *Wachsman ex rel Wachsman v. Islamic Republic of Iran*, 603 F.Supp.2d 148, 151 (D.D.C. 2009) (Finding that the decedent suffered both mental and physical harm when kept as a hostage for six days and was aware in the moments before his death that he would be executed, awarding damages commensurate with those findings.)

To simplify the process for determining the amount available for pain and suffering under the FSIA, when a victim is killed in the act of terrorism at issue, courts have generally set a standard recovery at $1,000,000 for pain and suffering lasting even a short amount of time. See *Fuld v. Islamic Republic of Iran*, Case no. 20-cv-2444-RCL, at 33 (D.D.C. March 28, 2024) ("Courts typically award $1 million to a victim who only survives a few minutes to a few hours after a bombing"). *See also*, *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998) (awarding $1,000,000 where the victim suffered 3-5 hours). *See also*, *Lee v. Islamic Republic of Iran*, 2023 U.S. Dist. LEXIS 20408, *8-10 (D.D.C. 2023) (finding that even if evidence of conscious pain and suffering is not conclusive, an estimate that the victim suffered for a matter of seconds up to several minutes prior to death in an explosion was sufficient to find that the Court should award the standard $1,000,000 to the Estate). *See also*, *Est. of Hirshfeld v.*

*Islamic Republic of Iran*, 330 F. Supp. 3d 107, 145 (D.D.C. 2018), *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112-113 (D.D.C. 2000) (finding that evidence amounting to a piece of the assailants' flesh under the victim's fingernails was sufficient for the Court to infer that he was conscious and experienced period of pain and suffering"), *et al*.

Plaintiff argues that due to the nature of Mr. Mahmoudzadeh's injuries, it is highly likely that he survived for at least several minutes after the area he was struck. *See supra,* FN 4. His official cause of death in the Report of Death of a U.S. Citizen issued by the U.S. Department of State was, "skull laceration with amputation of both legs due to explosion." Ex. 10. Due to the nature of the injury and the medium by which it occurred, it is highly likely that that Mr. Mahmoudzadeh hemorrhaged to death due to the extent of his injuries, particularly the loss of his lower extremities in the explosion (this type of injury is known as traumatic amputation). Ex. 37, Jon Clasper and Ramasamy, Arul, *Traumatic Amputations*, 7 BRIT. J. PAIN 2, 67-72, 68 (May 2013) (finding that in instances of traumatic amputations from explosives used in terror attacks ranging from IEDs to anti-personnel land mines, the leading cause of death is hemorrhage.) Death caused by hemorrhage from traumatic amputation from explosives can take up to several hours, depending on the extent of the injury, the location of the injury, and the health condition of the Plaintiff. *Id*. It is highly unlikely that someone who dies from traumatic amputation would die instantaneously such that they could be said to have experienced no pain or suffering.

Furthermore, an eyewitness that was present at the Compound with Mr. Mahmoudzadeh when the attack began, stated that he heard him screaming in pain after the explosion. See Ex. 3. ¶10. Unfortunately, no one was allowed back inside until hours later, due to the ongoing barrage of missiles making it unsafe. Ex. 3 at ¶10. Because of this, no one knows exactly how long Mr. Mahmoudzadeh was alive or conscious after he was injured, but it is certain that when they found him the next day, he was deceased. Ex. 3 at ¶10. The nature of his injuries should be

sufficient to allow the Court to infer that Mr. Mahmoudzadeh was alive for at least a period of time after his injuries and experienced a period of pain and suffering before succumbing to them before aid could reach him. This is reinforced by the findings in similar FSIA cases, such as *Lee* where the decedent, based on evidence that was "not conclusive", was estimated to have suffered for a matter of seconds up to several minutes prior to death in an explosion, and was awarded $1,000,000. *Lee*, 2023 U.S. Dist. At *8-10. Furthermore, as the court inferred in *Elahi*, context surrounding the injuries of the decedent may provide enough evidence to infer that the victim more likely than not experienced a brief period of pain and suffering such that his estate should be eligible for recovery. *See Elahi, supra,* at 113.

### 5. Alternative Request

In the alternative, Courts have instituted a 25% downward departure for victims who were aware they were in danger and feared for their lives but did not experience any pain prior to death. *See*, *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 72 (D.D.C. 2021) (finding that extrajudicial killings supported by Iran and the IRGC entitled Plaintiffs to recovery for the fear experienced prior to their executions, and awarding punitive damages); *See also*, *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 151 (D.D.C. 2009) (awarding estates of decedents damages because they were aware that they were going to be executed in the moments before their death, and experienced fear of their death in the days they were held hostage).

If the Court finds that Plaintiff has not offered conclusive evidence that Mr. Mahmoudzadeh experienced conscious pain and suffering after he was injured, Plaintiff argues that the Estate should still qualify for the 25% downward departure, totaling $750,000 for the time he suffered emotionally prior to the explosion that killed him because he was aware that he was in danger and in fear for his life, as established by the courts in cases such as *Selig* and

*Wachsman ex rel. Wachsman*. As the *Selig* Court explained, victims who were aware they were in danger and feared for their lives but did not experience any pain prior to death are eligible for the 25% downward departure from the $1,000,000 baseline. *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d at 72. Here, Mr. Mahmoudzadeh was in fear of attack for a month prior to the strike, significantly intensifying the morning of the attack, but heroically was unwilling to abandon his post. *See* Ex. 3, at ¶8-9. He and everyone else in Koya lived for a month with the constant hum of the Iranian drones overhead and the public threats Iran and the IRGC were making against Kurds in Iraq. *Id*. Furthermore, Mr. Mahmoudzadeh died in the Courtyard of the KDPI Compound, he was fleeing for his life with the rest of the humanitarian aid workers that were present that day when he was struck. *See* Ex. 3 at ¶10. He was not killed in the first strike, the barrage had already begun, and he ran from his office located in the headquarter building to seek safety. Id. at ¶10. See also Ex. 4, photo no. 9. In *Wachsman ex rel. Wachsman*, the Court awarded damages based in part on the fact that the decedent who had been held hostage, knew moments before his death that he was about to be executed. *See*, *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 151 (D.D.C. 2009). Mr. Mahmoudzadeh must have been in fear of imminent death in the moments leading up to his injury. The terror he must have experienced as missiles began to rain down on Koya is indescribable, particularly in peacetime. The circumstances of his death and the moments leading up to it, which are corroborated by the statements of Mr. Karim Farkhapur, would have left any person to be aware of the danger they were facing, and to be in fear for their lives. For these reasons, if the court does not find sufficient evidence of his pain and suffering after he was struck, the Plaintiff asks that the Court apply the 25% downward adjustment and award Mr. Mahmoudzadeh's estate $750,000 for the mortal fear he felt prior to his death.

### 6. Conclusion: Estate's Omer Mahmoudzadeh's Pain & Suffering Damages

In conclusion, Plaintiff, Estate of Omer Mahmoudzadeh qualifies under FSIA precedent for damages for pain and suffering in the amount of $1,000,000 USD. Alternatively, if the Court finds that evidence of his pain and suffering are insufficient due to the chaotic nature of the attack, Plaintiff at a minimum should receive the 25% downward departure for the fear he experienced prior to his death, amounting to $750,000.

### A. Damages for Solatium & Intentional Infliction of Emotional Distress for Plaintiffs Shiwa Nahadi and Tara Mahmoudzadeh

#### 1. Shiwa Nahadi

Shiwa Nahadi was victimized by the Iranian regime early in her life as a Kurdish woman, and many of her community members and family members were imprisoned and killed "for demanding their basic human rights", leading her to seek safe haven in the United States as a refugee. Ex. 1 at ¶3 and 11. She settled into her new life in the United States, hoping that the trauma of her life in Iran was behind her. *Id*. at ¶3. When she met Omer "Chicho" Mahmoudzadeh, who was assisting Kurdish refugees in the United States at the time, she fell in love with his simplicity, kindness, and commitment to humanitarian causes. *Id*. at ¶4. Chicho and Shiwa's love grew from the common passion they due to their similar background as Kurds and their belief in human rights and assisting the most vulnerable, and they got married and had a beautiful daughter together, Tara Mahmoudzadeh. *Id*. at ¶4.

When Chicho decided that he was needed in Iraqi Kurdistan assisting refugees, Shiwa supported her husband's decision because she understood his passion and the importance of the work. *Id*. at ¶5. However, she never imagined that this dedication would lead to his death. When she received the news, which she described as the most shocking news she has every received, she said that "my world turned upside down. I could not breathe." *Id.* ¶6. Adding to the trauma of losing her husband in this violent manner, she was inundated with news stories detailing the

brutal terrorist attack that killed her beloved husband and father of her child. *Id*. at ¶9. The news threw her into a deep grief, and she says her memories from that day are clouded due to the severe emotional trauma she was suffering. *Id*. at ¶14-16 and 6.  The pain of Chicho's loss, which Shiwa says is with her every minute of every day, is unbearable: "every passing minute is laden with the weight of his memory, each one wonderful but at the same time a painful reminder. It is an unbearable pain that I wish no one will ever experience." *Id*. at ¶ 12.

The image of his violent death haunts her, and it has affected both her mental and physical health. *Id*. at ¶16-18. Shiwa developed intense stress symptoms during the period after his death, and these health issues persist; she began to experience elevated blood pressure and cholesterol, hair loss, stomach issues, a weakened immune system, chronic insomnia, and more. *Id*. at ¶13. Her doctor has informed her that her body has been under so much stress that it has likely increased her risk of cancer. *Id*. at ¶13.

Shiwa, who is still working two jobs to support herself and Tara, moves through life with an unfillable emptiness: "Until the day I die, this emptiness will remain." *Id*. at ¶14. She has withdrawn from her once vibrant social life, and it takes all the energy she can muster to simply make it through each day. *Id*. at ¶15. She says that she relives the trauma of losing Chicho over and over again, consistently exhausted, and sick since Chicho died. *Id*. at ¶16.  This trauma is only made worse by having to watch as her daughter tries to navigate her own loss and trauma and subsequent mental health issues. *Id*. at ¶17 and 19. Other than each other, Shiwa and Tara feel that they have been left completely on their own since Chicho's death, "without any kind of support system to help us through this hardship." *Id*. at ¶18. The traumatic and violent death of her husband and the father of her child at the hands of the same regime that has been responsible for the deaths of so many other members of her family and community is an unbelievable burden on Shiwa. *Id*. at ¶11 and 17. Even participating in this lawsuit is daunting and traumatic for

Shiwa and Tara, but they do it in Chicho's memory, with the belief that Iran should be held accountable for the pain and suffering that it has caused. *Id*. at ¶19.

## 2. Tara Mahmoudzadeh

Tara Mahmoudzadeh is the daughter of Shiwa and Chicho, born in Virginia in 2002. *See* Ex. 8. She was barely 20 years old when she lost her father to the terrorist attack launched by Iran in September 2022. She describes the loss of her father as "a horrific shock" that created "the worst imaginable pain I have ever experienced." Ex. 2 at ¶1. When her mother and sister told her that her father had been killed, she went into a state of complete shock and devastation: "I immediately fell into a state of complete shock, everything after this is blurry in my memory. The instant feeling of shock, the feeling of your heart stopping, that pain cannot be described. For hours I was in this state of mind… I was not responsive and my family worried that I was having an intense physical reaction to the shock of the news. I still have little memory of the details around the hours after I received the information to how traumatic it was for me." *Id*. at ¶5. Tara could not believe that her father was really dead and began obsessively reading the news surrounding the attack in the days afterward. *Id.* at ¶6. The only solid proof she could find that was confirming this nightmare were the hundreds of social media posts sharing footage and information about the attack, and from Kurdish news outlets, until finally she saw a post by "Iran International", posting an image of her father, and naming him as the "one U.S. Citizen" that was killed in the attack. *Id.* at ¶7. A couple of days after the attack, Tara saw a video circulated by the Iranian regime discussing the success of the attack and footage of the launch of the missiles, where an IRGC soldier yells "Allahu Akbar!" before firing. *Id.* at ¶9. She describes this video and the sound of that statement as severely triggering for her, and she has an intense trauma response to anything that reminds her of it still today. *Id.* at ¶9-10.

Losing your father at this young age would be traumatic for anyone, but to lose him in such a violent senseless way, that is publicly broadcast and spread around social media is particularly disturbing. Tara says that she struggles in particular around the holidays or any time she thinks about the future, having to navigate it without her father. Id. at ¶11. She, like her mother, has fallen into a deep depression, experiencing mental health issues and anxiety; she isolates herself because her ability to function on a day-to-day basis, or interact socially has been severely impacted by this loss. *Id*. at ¶11-12. She states that, "the mental distress I feel has hindered me from my daily life, making it incredibly difficult to function normally. My ability to socialize have severely been affected, as I do not have the energy or motivation to maintain my relationships that were once a cornerstone of my day-to-day life.…" *Id*. at ¶11. Tara has begun to suffer from insomnia and night terrors, often waking up in tears when she does manage to fall asleep. *Id*. at ¶11. Tara says it is all she can manage to make it through work each day and is in a state of constant exhaustion and anxiety. *Id*. at ¶11-12. Though Tara does her best to move forward, going back to school and trying her best to remain functional, she says that "the pain and affliction that this has brought has altered every aspect of my previously normal life. " *Id*. at ¶13.

When she thinks of the future, she is confronted with the fact that her father "will not be there for significant milestones like my graduation or walking me down the aisle on my wedding day, witnessing my growth into an accomplished, independent woman." Id. at ¶14. These are just some of the memories that the Iranian regime has stolen from Tara. She feels that she cannot fully or properly mourn her father's death, as it is too dangerous for her and her mother to go to Koya, Iraq to visit his grave. *Id*. at ¶15. Like her mother, Tara feels that this lawsuit may be the only justice they are ever able to seek for the loss of Chicho. *Id*. at ¶15.

### 3. Analysis & Quantum of Damages

Both solatium damages and punitive damages are specifically provided for in the statute. Solatium claims under FSIA "are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014). In the past, claims for emotional distress under FSIA were based on the state law of the victim's residence. *See, e.g., Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 62-63 (D.D.C. 2006). In 2008, however, the applicable statutes were amended to create the free-standing federal causes of action found in § 1605A(c). *See Owens v. Republic of Sudan*, 864 F. 3d at 807-809.

In the long line of FSIA cases before this Court, it has presumed "that those in direct lineal relationships with victims of terror suffer compensable mental anguish . . .", entitling them to damages for solatium and intentional infliction of emotional distress. *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 25 (D.D.C. 2011) ("*Oveissi III"*). To make it easier for Courts to decide on the amount of non-economic damages to award in FSIA cases, Courts in this District have established a baseline amount for each family member or decedent with calculable percentages of upward or downward departure based on a variety of factors. Non-economic damages have been assessed with a starting baseline of 8 million dollars ($8,000,000) for spouses of victims and 5 million dollars ($5,000,000) for children of victims. *See, Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) (creating what is now referred to as the "*Heiser* framework"). *See also*, *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 50 (D.D.C. 2014) (finding that children suffer as much as parents).

Additionally, Courts have instituted a 12.5% upward departure for cases where there is a demonstration of an extraordinarily close relationship. *See*, *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006) (granting plaintiff $9 million for the loss of his wife and unborn child). *See also*, *Oveissi III*, 768 F. Supp. 2d at 28 (D.D.C. 2011) (applying an

upward adjustment for the grandson of a victim because they had an extraordinarily close relationship resembling that of a parent and child.) Furthermore, Courts have awarded an upward departure of 20-25% in cases where the circumstances surrounding the death are particularly agonizing or where the family members have suffered severe emotional trauma as a result. *See*, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 23-24 (D.D.C. 2009) (instituting a 20% upward departure where the Plaintiff Husband of the deceased, saw his wife's severely dismembered body shortly after the attack). *See also*, *Lelchook v. Syrian Arab Republic*, 2019 U.S. Dist. LEXIS 163642, *8, *14 (D.D.C. 2019) (instituting a 25% upward departure where a daughter learned of her father's death on the news and required medical intervention).

Furthermore, the *Oveissi III* Court found that an upward adjustment of non-economic damages was appropriate due to the (1) "sudden and unexpected" nature of the family member's murder, (2) the family's subsequent fear of reprisal and continued danger to their lives amplified the effects of their grief, and (3) the circumstances of such a traumatic loss causing an "acute feeling of 'permanent loss or change caused by the decedent's absence. *See Oveissi III*, at 29-30 (instituting a 50% increase in non-economic damages to the Plaintiff).

Plaintiffs Shiwa and Tara, as the beloved wife and daughter of the decedent, are in a direct lineal relationship with Mr. Mahmoudzadeh, a victim of terror, and can therefore be presumed to suffer compensable mental anguish, entitling them to damages for solatium and intentional infliction of emotional distress. *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 25 (D.D.C. 2011) ("*Oveissi III*"). *See also* Ex. 7, Certificate of Marriage and Ex. 8, Birth Certificate. Following the *Heiser* framework, Plaintiff Shiwa Nahadi, as the spouse of the decedent is entitled to a baseline amount of $8,000,000 in non-economic damages; Plaintiff Tara Mahmoudzadeh, as daughter of the decedent, is entitled to a baseline amount of $5,000,000. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d at 269.

Furthermore, Plaintiffs believe they should be entitled to the upward departure of 25% each, due to the extraordinarily close relationship each had with Mr. Mahmoudzadeh and the severe trauma and particularly agonizing circumstances surrounding his death. *See Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d at 23-24, *Lelchook v. Syrian Arab Republic*, 2019 U.S. Dist. LEXIS at *14. As in these cases and *Oveissi III*, the death of Mr. Mahmoudzadeh was sudden and unexpected and have left both Shiwa and Tara with an acute feeling of "permanent loss or change caused by the decedent's absence". *See Oveissi III*, at 29-30. *See generally* Ex. 1 and Ex. 2. Both have experienced mental and physical manifestations of their extreme grief well beyond what would be expected in the case of a family member's natural death. *See* Ex. 1 at ¶13 and Ex. 2, at ¶11-12. Both have developed chronic anxiety, symptoms of deep depression, and insomnia because of the trauma of losing Chicho in this way. *See* Ex. 1 at ¶13 and Ex. 2 at ¶11.

Furthermore, as in *Lelchook*, Plaintiffs found out about the details of Mr. Mahmoudzadeh's death largely through social media and the news coverage of the attack on Koya, Iraq, only to have his death officially confirmed the next day by the U.S. State Department. Ex. 1 at ¶9-10, Ex. 2 at ¶7. *See Lelchook*, 2019 U.S. Dist. LEXIS 163642, at *8. The Court in Lelchook felt that the trauma from discovering the news of a loved one's death [or the details of it] on the news or social media entitled the Plaintiffs to a 25% upward departure. *Id*. at *8. As described by Tara Mahmoudzadeh, she now suffers traumatic reactions and triggers surrounding certain video clips she was exposed to in the aftermath of the attack. Ex. 2 at ¶9. Ms. Shiwa Nahadi has developed a long list of health issues and was told by her doctor that she was at an elevated risk of cancer due to the high amount of stress she has been under since Mr. Mahmoudzadeh. Ex. 1 at ¶13. Ms. Shiwa Nahadi came to the United States as a refugee and found her family and new life in Mr. Mahmoudzadeh; she lost not only her husband and father to her child, but her main pillar of emotional support and companionship in this country. Ex. 1 at

¶4; 18-19. Tara Mahmoudzadeh can no longer look forward to the many milestones ahead of her without falling into despair, because she knows her father will no longer be a part of them. Ex. 2 at ¶14.

The circumstances surrounding Mr. Mahmoudzadeh's death are deeply and extremely traumatizing to both Tara and Shiwa. His death was incredibly violent; they cannot help but picture the last moments of his life, the deafening noise and pandemonium unfolding around him as he ran for his life with the other humanitarian aid workers; the air filled with dust and the sound of explosions. They cannot help but see his broken body lying in the courtyard, his legs blown off, and his last moments filled with pain and fear. That is more than any family member could bear and should constitute circumstances that are particularly agonizing. *See*, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 23-24 (D.D.C. 2009).

These circumstances entitle Plaintiffs to an upward departure of 25% each, for solatium and intentional infliction of emotional distress, amounting to **$10,000,000** for Shiwa Nahadi and **$6,250,000** for Tara Mahmoudzadeh. However, if the Court finds that Plaintiffs are not entitled to an upward departure, they are entitled to the baseline recovery as direct family members of the decedent, in the amounts of $8,000,000 for Shiwa Nahadi as Mr. Mahmoudzadeh's spouse, and $5,000,000 for Tara Mahmoudzadeh as Mr. Mahmoudzadeh's child.

### B. Economic Damages

28 U.S.C. § 1605A(c) also provides for economic damages, and section 1605A(d) addresses additional damages for property loss. However, Plaintiffs in this case are not requesting economic damages, because Mr. Mahmoudzadeh was a humanitarian aid volunteer, and they are therefore not able to show the needed evidence of economic damages necessary.[7]

---

[7] This is also why Plaintiffs are not arguing for relief under a theory of wrongful death. Please see FN 3. However, if the Court finds that a common law theory of relief is still needed here,

### C.  Pre-Judgment Interest

Plaintiffs are asking for Prejudgment Interest. In particular, since Shiwa and Tara

couldn't claim the Economic Damages due the nature of Chicho's volunteer work. "Whether to

award prejudgment interest 'is a question that rests within this Court's discretion, subject to

equitable considerations.'" Cabrera, 2022 U.S. Dist. LEXIS 127290, 2022 WL 2817730, at *54

(quoting Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 58 (D.D.C. 2012)). "This

Court [*67]  and several others in this District have previously awarded prejudgment interest on

similarly situated plaintiffs' awards, including pain and suffering and olatium." Id. (quoting Ewan

v. Islamic Republic of Iran, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (collecting cases)). Kar v.

Islamic Republic of Iran, 2022 U.S. Dist. LEXIS 178125, *66-67. "the Court concludes—as it

has done in the past—that an award of prejudgment interest is appropriate," 2022 U.S. Dist.

LEXIS 127290, [WL] at *55 (citation omitted). "Awards for pain and suffering and solatium are

calculated without reference to the time elapsed since the attacks." Ewan, 466 F. Supp. 3d at 250

(citation omitted). "A solatium award is therefore best viewed as fixed at the time of the

loss," id. (citation omitted), and failing to award plaintiffs prejudgment interest would

permit Iran to profit from the use of the money in the time between plaintiffs' injuries and the

damages award, id.

For calculating the pre-judgment interest the Plaintiff suggests to use the Federal

Reserve's data for the average annual prime rate in each year from September 28, 2022, the date

Omer Mahmoudzadeh is killed —through the date of order as it has been done previously

---

wrongful death is the most applicable, and the details regarding extrajudicial killing should be
applicable and inferred. *See Fuld v. Islamic Republic of Iran*, Case No. 1:20-cv-03492-RCL, at
29 (D.D.C. March 28, 2024).

in Cabrera, 2022 U.S. Dist. LEXIS 127290, 2022 WL 2817730, at *55. If we assume the date of the Court's order in December 31, 2024, we suggest to following calculation[8]:

| Duration in each year | Average Prime Rate | Calculated Year interest multiplier | Accumulated rate multiplier |
|---|---|---|---|
| 3 months, 0.25 | 0.07 | 1.0175 | 1.0175 |
| 12 months, 1 | 0.082 | 1.082 | 1.100935 |
| 12 months | 0.085 | 1.085 | **1.19451448** |

In conclusion, we are asking the Court to multiply the pain and suffering damages for Tara and Nawid with **1.19451448** to calculate the total compensatory damages.

### D. Punitive Damages

The FSIA statute also provides for punitive damages. 28 U.S.C. § 1605(c). Punitive damages under FSIA are intended to "punish and deter the actions for which they are awarded." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-56 (D.D.C. 2012) ("*Oveissi IV*"); *see also Kim v. Democratic Republic of Korea, supra,* at 290-91 ("Punitive damages are not meant to compensate the victim but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future.")

### 1. Background on the Attack on September 28, 2022

The KDPI and its associated refugee camps, as an exiled Iranian entity, have endured decades of persecution, threats, and attacks in the Kurdistan Region of Iraq. *See* Ex. 26. The history of the Kurdish populations that call this area home is marked by enduring challenges, as they have been subjected to ongoing political pressure from the Iranian Regime and the IRGC.

---

[8] This process mirrored the process it used for calculating prejudgment interest in Cabrera, 2022 U.S. Dist. LEXIS 127290, 2022 WL 2817730, at *55-56 & n.46

*Id.* The attack on September 28, 2022, is not the first time the IRGC has targeted the KDPI community in Koya, Iraq. In 2018 the Iranian regime orchestrated a missile attack against the KDPI headquarters and its refugee camps, which killed 16 people. *See* Ex. 3 at ¶3. *See also*, Ex. 26 ("In September 2018, Iranian missiles struck the headquarters of two Iranian Kurdish parties in Koya, killing at least 14 people"). Due to the constraints on their movement within Iraq, imposed by these circumstances, they have become an easy target with correlation to ongoing political and civil instability within Iran.

Mr. Mahmoudzadeh is not the only innocent that lost his life in the unprovoked and illegal drone and missile strike on KDPI headquarters and surrounding refugee camps on September 28, 2022. The strike killed at least thirteen and left more than 50 injured, 20 of them refugee children, who were in school studying at the time of the attack. See Ex. 42 at 1. A pregnant woman and her infant were killed in the same attack. *Id.* The casualties of this attack are not only tragic but demonstrate the illegality of the attack under international law, not just because it was an unprovoked use of force on the territory of a sovereign country, but because it specifically targeted refugees.

The same day, the Islamic Revolutionary Guard Corps ("IRGC") released official statements confirming that they were responsible for launching the attack against the Kurdistan regions of Northern Iraq, referring to the attack as a "success." See Ex. # 12-18. The day after the attack, the IRGC, through their official news network, confirmed that Omer Mahmoudzadeh was one of the persons killed in the attack, releasing his photograph. *See* Ex. 13. The IRGC, through news networks controlled by the regime, circulated footage and statements of the attack showing the sophisticated coordination of the attack from Iranian territory, including drone video footage with commentary by IRGC leadership. *See* Ex.'s 12-18.

Pictures of the scene after the drone and missile strikes depict frightened refugee children, huddled together, seeking shelter beneath the ruins of the demolished schooling and refugee camp organization structures. *See* Ex. 4, photos no. 1-8. See also Ex. 42 photos of Koya. It was estimated by Iraqi officials and confirmed by IRGC statements that over 70 ballistic missiles and Iranian Suicide Drones (Shahed-131 and 136)[9] were launched on the region on September 28, 2022. *See* Ex. 34, Defense Intelligence Agency Report, p. 9, ("The Iranian Shahed-131 wing stabilizer featured below was recovered after a publicly claimed Iranian UAV and missile attack against the Kurds in northern Iraq on 28 September 2022"). See also, Ex. 51 at 7-9. See also Ex. #3 Picture #9. See also Ex. 4, photo no. 9 (showing where bombs hit around KDPI headquarters).

This lethal and indiscriminate attack by Iran and the IRGC on these refugee camps and on the headquarters of the KDPI was completely unprovoked by any entity inside of Iraq. Iran had no just cause under international law to launch this kind of attack.[10] It was an unjustified, illegal, inhumane, and politically motivated method of oppression and punishment against Kurdish minorities and refugees both in Iran and in Iraq. There was no military justification or judicial process, and amounts to the extrajudicial killing of civilians, including children, women, and humanitarian aid workers.

---

[9] *See*, "VIDEO  MEHR NEWS AGENCY (October 2, 2022) https://en.mehrnews.com/news/191995/VIDEO-Moment-when-Shahed-136-drone-hits-terrorists-bases. (Video released by Iranian news agency largely controlled by the regime in the days after the attack, stating that "IRGC's Ground Force on Monday launched artillery and drone attacks against…groups in the Iraqi Kurdistan region…").

[10] The *Jus Ad Bellum* is the law governing the resort to force under international law. The Charter of the United Nations prohibits the use of force against the territorial integrity of a state, and only recognizes the right to use force under the right to self-defense. See, U.N. Charter, Art. 2(4) and Art. 51.

In a press release on September 28, 2022, the same day as the attack, the U.S. State Department strongly condemned the attack on Koysinjaq, and Iran's use of ballistic missiles, and suicide drones on the Kurdistan Regions. Ex. 20. The U.S. State Department qualified these acts as an unjustified violation of Iraqi sovereignty and territorial integrity. Id. See also, Ex. 19. In addition, U.S. Ambassador Richard Mills delivered a briefing at the UN Security Council Briefing on the issue; "I must start by strongly condemning the IRGC missile and drone attacks in the Iraqi Kurdistan Region on September 28. Iran Mred at least 48 ballistic missiles – a major escalation of Iranian violations of Iraqi sovereignty. Iran's Wagrant violation of Iraq's sovereignty and territorial integrity must stop. Such a brazen attack on a neighbor's territory, especially one that results in the deaths of innocent civilians, is morally reprehensible." See Ex. 30.

In addition, several U.N. agencies and foreign states condemned the attacks and expressed their concerns on attacking civilians and refugees. Iraq's Ministry of Foreign Affairs stated that "The Ministry of Foreign Affairs condemns in the strongest terms the artillery and rocket bombardment by the Iranian side, in addition to using twenty drones carrying explosive materials, which targeted four areas in the Kurdistan region of Iraq, causing loss of lives of a number of citizens and wounding others, in a serious development that threatens the security and sovereignty of Iraq, and aggravate the effects of fear and dread on safe civilians." See Ex. 22. U.N. Security General issued a statement: "The Secretary-General is following with concern the reported shelling of the Kurdistan Region of Iraq, including in civilian areas. He calls for an immediate de-escalation and urges respect for Iraq's sovereignty and territorial integrity, and the principle of good neighborly relations." See Ex. 23. In addition, Unite Kingdom condemns Iranian attacks; "Iran must cease its indiscriminate bombardment of Kurdish towns which has led to the loss of innocent lives and damaged civilian infrastructure. These attacks are a violation of

Iraq's sovereignty and territorial integrity and are wholly unacceptable. They demonstrate a repeated pattern of Iranian destabilising activity in the region." See Ex. 24 and 25. Government of Japan also confirmed and condemned the attack, and confirms that IRGC took responsibility of this attack[11]:

> "Since September 24 (local time), attacks including multiple rocket launches have taken place against the Kurdistan region of northern Iraq, resulting in the deaths of 13 people and many injuries on September 28.
> The Islamic Revolutionary Guard Corps (IRGC) has announced that it has carried out this attack on Iranian-Kurdish opposition groups in the Kurdish region.
> The Government of Japan strongly condemns these attacks, which threaten the sovereignty and stability of Iraq and the peace of the entire Middle East region, and greatly deplores the loss of life.

The U.N. High Commissioner for Refugees released a statement condemning the attacks, stating they were "gravely concerned about today's attack, which impacted the Iranian refugee settlements in Koya, the Kurdistan Region of Iraq. Ex. 29. The attack is reported to have resulted in a number of civilian casualties and injuries, including Iranian refugees – among them are women and children."[12]  In line with the international reaction, UNICEF stated that the attacks on school children and their facilities are unacceptable and is a grave violation of children's rights. Ex. 41. Furthermore, Ambassador Richard Mills, the Deputy U.S. Representative to the United Nations, stated in the wake of the attacks that he was "strongly condemning the IRGC missile and drone attacks in the Iraqi Kurdistan Region on September 28.[13] Additionally Human

---

[11] See Exhibit 28.
[12] Furthermore, the UNHCR press release explained that the attack impacted a primary school where refugee students were present. See, Ex. 29, Statement of the UNHCR, 28 Sep 2022).
[13] *See*, Ambassador Richard Mills, Remarks at a U.N. Security Council Briefing on Iraq, United States Mission to the United Nations, October 4, 2022. He further stated that "Iran fired at least 48 ballistic missiles – a major escalation of Iranian violations of Iraqi sovereignty. Iran's flagrant violation of Iraq's sovereignty and territorial integrity much stop. Such a brazen attack on a

Rights Watch issued a report one month after the attack, which shows the human tragedy of the attack, "According to UNICEF, the attacks in Koya struck a school in a refugee settlement, injuring two children and killing a pregnant woman. Human Rights Watch identified the woman as Reyhane (Shima) Kanaani.[14]" See Ex. 26. Numerous other countries and a plethora of news agencies joined in condemning the attacks and confirming that the IRGC had claimed responsibility for them. *See, e.g*., Ex's 22-25; 28-31.

## 2. Background on Iranian Drone Program

Iran's robust drone program poses significant security challenges and risks to US interests and regional stability. Over the past decade in particular, Iran has made substantial investments in developing and expanding its fleet of unmanned aerial vehicles (UAVs), demonstrating its commitment to enhancing military capabilities and projecting power across the Middle East. *See*, Ex. 57 at 2. *See also*, Ex. 47, Ex. 52. The proliferation of Iranian drones not only augments Tehran's own military operations but also empowers its proxies, presenting a multifaceted threat to US forces, allies, and vital infrastructure in the region. See e.g., Ex. 48 at 1, Ex. 54, and Ex. 57 at 4, 59.[15] Countering and deterring Iran's drone program has become a central piece of U.S.

---

neighbor's territory, especially one that results in the deaths of innocent civilians, is morally reprehensible."

[14] Ex. 26, The report further stated: "Our home is one and half kilometers away from the party headquarters," said Zanyar Rahmani, Kanaani's husband, who works at the KDPI offices that were attacked. "[We live] in a camp for refugees, mostly women and children live there. The area where my wife and I live is not a military place, it is residential for civilians."
Kanaani was 36 weeks pregnant with their son, whom they named Waniar, her husband said. Following the attack doctors delivered the baby then operated on Kanaani, who suffered injuries to the back of her head and internal bleeding. She died from her injuries. Waniar suffered brain damage and also died. "My son was healthy [before the attack], until that moment all the sonograms showed he was healthy," Rahmani said.

[15] "…Iran is proliferating drones and related technologies to its terrorist and militia proxies in violation of U.N. Security Council resolutions. Iran proxies, most notably Hezbollah, Hamas, the Houthis, and Iran-backed Iraqi Shi'a militias, have all benefitted from Iran's technical drone knowhow and possess drones either manufactured in Iran or based on Iranian models. The

foreign policy initiatives, reflecting the importance of this issue to U.S. interests. *See, e.g.*, Ex. 53 (the "Stop Iranian Drones Act"). *See also*, Ex. 54, and Ex. 55.

Iran's drone development program traces back to the Iran-Iraq war in the 1980s and has undergone rapid advancement in recent years as the regime has significantly expanded its inventory of UAVs over the past decade. *See, e.g.*, Ex. 45, Ex. 48 at 1. These drones provide Tehran with strategic flexibility, enabling it to project power and exert influence in regional conflicts and power struggles. *See*, Ex. 47.

Iran's aggressive use of drones extends beyond its own military operations. The Iranian regime has exported UAVs to various actors, including Russia[16] and proxy groups like the Houthis in Yemen.[17] Reports indicate that Iranian drones have been employed by Russia in devastating strikes during the Ukrainian conflict and were used in the Civil war in Syria and Yemen, underscoring Tehran's role in enabling destructive actions far beyond its borders. *Id. See also* Ex. 50 (Iranian General boasts that 22 different countries are vying for Iranian drones).

The proliferation of Iranian drones to terrorist groups, such as the Houthis, raises significant concerns about the potential use of these systems against American interests. Furthermore, both the Iranian regime and the proxy groups that Iran is providing these drones to systematically use them to target civilians. See, Ex. 57 at 59 ("Iran and/or its proxies have the capability to utilize drones against U.S. personnel, interests, and allies throughout the region, as well as against civilian populations."). In fact, the United Nations Security Council has documented Iran's

---

provision of drones to its proxies gives Iran increased ability to threaten the U.S. and its regional allies." Ex. 57 at 4.

[16] For information on UAVs of Iranian origin used by Russia in its war in Ukraine, see, e.g., Ex. 48 at 1, 7-9; Ex. 51 at 1 and 3; Ex. 52; Ex. 58; and Ex. 59.

[17] For information on UAVs and missiles provided to the Houthis by Iran, *See*, e.g., Ex. 34; Ex. 48 at 1; Ex. 49 at p. 32-33 ("An increasing body of evidence suggests that individuals or entities in the Islamic Republic of Iran supply significant volumes of weapons and components to the Houthis in violation of Paragraph 14 of Resolution 2216 (2015)"). See also, Ex. 52; Ex. 57 at 4.

supply of weapons and components to the Houthis, a violation of international resolutions aimed at maintaining regional stability and peace. See, UNSC Res. 2231. See also, Ex. 57 at 4 and 45; Ex. 48 at 7.

Among Iran's diverse array of drones, the Shahed-136 stands out as a notable and concerning model, and one of the main drones used to attack Koya, Iraq on September 28, 2022. *See* Ex. 34 at 9. This UAV, also known as a "suicide drone," is designed for one-way missions, carrying explosives and diving toward its target to detonate on impact. Ex. 51 at 3. The Shahed-136 exemplifies Iran's development of unconventional drone technologies tailored for asymmetric warfare and precision strikes. Its deployment in conflicts such as the Yemeni Civil War, the Russian-Ukrainian conflict, and Iranian operations in Syria and Iraq, including the one at issue in this case, underscores Tehran's willingness to utilize drones as a strategic tool to project power and influence, without regard for civilian harm or international law. See, e.g., Ex. 34, Ex. 59, and Ex. 48 at 1. The proliferation of the Shahed-136 to proxy groups further amplifies the threat posed by Iranian drones, as these unmanned systems can be used effectively by non-state actors to target US and allied interests in the region. As part of Iran's broader drone program, the Shahed-136 symbolizes the evolving nature of modern warfare, where unmanned systems play an increasingly prominent role in shaping regional dynamics and security landscapes.

The proliferation and deployment of Iranian drones in the Middle East pose significant dangers to civilian populations and regional stability. Iranian drones, including models like the Shahed-136[18] and others, have been used in various conflicts across the region, often targeting civilian infrastructure and populations. *See* Ex. 34 at 9. *See also* Ex. 48 at 4-5; Ex. 59. The use of drones equipped with explosives or precision strike capabilities raises serious humanitarian

---

[18] *See* Ex. 59

concerns and exacerbates the impact of ongoing conflicts on civilian populations. Furthermore, the proliferation of Iranian drone technology to proxy groups increases the risk of indiscriminate targeting and collateral damage, posing a direct threat to regional stability and the safety of civilian communities. *See* Ex. 54. This underscores the urgent need for international efforts to mitigate the risks posed by Iranian drones and prevent further escalation of conflicts that endanger civilian lives in the Middle East.

Addressing the Iranian drone threat presents complex challenges. Efforts to implement multilateral export controls and sanctions have had some impact, but Iran's defense industries remain resilient and adaptable. *See* Ex. 48 at 2. Sanctions have succeeded in limiting resources and extending development timelines, but Iran continues to innovate and proliferate its drone technology, often using commercially available components that evade direct control lists. *See* Ex. 47. The United States and its allies have implemented targeted measures, including sanctions on Iranian drone-related entities and efforts to disrupt procurement networks supporting Iran's UAV programs. However, these efforts must navigate a complex landscape of international partnerships and illicit arms transfers facilitated by Iran's extensive network of state and non-state actors.

It is imperative for the United States to deter the Iranian drone program for several critical reasons. Firstly, Iran's aggressive development and proliferation of drones pose a direct threat to US interests, allies, regional stability, and international peace. The deployment of Iranian drones both by the regime itself and by proxy groups, such as the Houthis in Yemen, has already resulted in attacks on US allies, civilian populations that the regime views as enemies of the state (like the Kurds in Iraq), and vital infrastructure in the region. See, e.g., Ex. 48 at 9. Secondly, the advanced capabilities of Iranian drones, including their precision strike capabilities and use of unconventional tactics like suicide drones, demonstrate the potential for significant disruption

and casualties if left unchecked. Thirdly, the proliferation of Iranian drone technology to other state and non-state actors increases the risk of escalation and conflict across the Middle East. *See, e.g*., Ex's 45; 48-59. Lastly, countering the Iranian drone program is essential for maintaining US deterrence and credibility in the region, signaling to Iran and its proxies that aggressive actions using drones will be met with a robust and effective response. *See* Ex. 48 at 8-9; Ex. 51 at 1; and generally, Ex. 54. By deterring the Iranian drone program, the United States helps to safeguard regional stability, protect its interests and allies, and prevent further escalation of conflicts fueled by Iranian-sponsored drone attacks.

Economic punishments serve as a valuable deterrent against the Iranian drone program by directly impacting Iran's financial incentives, increasing costs and risks, and signaling resolve and commitment to addressing the security threat that Iran's drone program poses. Sanctions are one powerful way to enact economic punishment, but the issuance of punitive damages in specific cases such as this one, where the Iranian regime has caused measurable harm to the United States through the murder of one of its citizens, sends a clear message that these types of attacks, perpetrated in violation of international law, will not go unpunished. *See, e.g.,* Ex. 54 and Ex. 55.

### 3. Liability for Punitive Damages

Courts have routinely awarded punitive damages in FSIA cases, particularly since the statute was amended to specifically allow for them in 2008. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 84 (D.D.C. 2011) (vacated in part, on other grounds, damages upheld by *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90 (D.D.C. 2011)). Where the Defendant is a foreign Sovereign state with access to enormous wealth, such as Iran, punitive damages should be substantial to have an actual deterrent effect. *See*, *Oveissi I*, 879 F. Supp. at 56–57 ("As to deterrence and wealth, Iran is a foreign state with substantial

wealth and has expended significant resources sponsoring terrorism.").Courts have generally applied a 4-factor test in determining the appropriate methodology and dollar amount of a punitive damages award: "(1) the character of the defendant's act (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause (3) the need for deterrence, and (4) the wealth of the defendants." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 44, 59-60 (D.D.C. 2018) (applying a 4-factor test in determining the number of punitive damages to award in an FSIA case and awarding each plaintiff $150 million in punitive damages).

Firstly, the character of the defendant's act is act of terrorism at issue in this case amounted to a 4-hour long barrage of targeted ballistic missiles and suicide drones by the Islamic Republic of Iran and its IRGC against civilian refugees located in a sovereign nation. It was an unjustifiable and blatant breach of international law, and amounts to at a minimum, the extrajudicial killing of over a dozen innocent persons, including U.S. Citizen Omer Mahmoudzadeh. *See, e.g.*, *Warmbier*, 365 F. Supp. 3d at 60.

Secondly, Iran intended to cause the civilian harm to the Kurdish-Iranian refugees living in Koya City Iran, which is made clear by the excessive amount of munitions dropped on this small area (totaling at least 70 over four hours). *See* Ex. 42 at 4. The purpose of this attack was to terrorize the Kurdish population there, and while Iran may not have had specific intentions to kill Mr. Mahmoudzadeh or to deprive Plaintiffs of their family member, their purpose was to terrorize and kill, and the grief and trauma experienced by Plaintiffs is an obvious consequence of Iran's actions. See Exhibits 12-18.

Thirdly, Iran's behavior must be deterred. It is part of a long pattern of human rights violations that defies international norms of sovereignty and humanity. The FSIA and the State Department "state sponsor of terrorism" designation were designed to deter such terroristic acts

and to provide some semblance of recourse to victims of nations like Iran. *See, e.g.*, FN 38. Furthermore, as discussed in the Background on Iranian Drone Program *supra*, deterring Iran's drone program is of central importance to not only U.S. foreign policy interests, but also for maintaining peace and stability internationally and particularly in the Mid-East region. *See*, § Background on Iranian Drone Program *supra*. Finally, Iran is a vast nation with substantial resources. Only a substantial punitive damages award has any chance of deterring their behavior, particularly considering the breadth of the drone program.

Courts in have articulated three main approaches to calculating punitive damages in state-sponsored terrorism cases. The first method, which typically results in the highest level of punitive damages, "involves multiplying the foreign state's annual expenditures on terrorism" by a factor between three and five." *Fuld*, at 28, citing *Valore*, 700 F. Supp. 2d at 87-88. Due to the incredibly high judgments this method results in, often billions of dollars, it is usually only applied in cases "of exceptionally deadly attacks, such as the 1983 bombing of the Marine Barracks in Beirut, which killed 241 American military servicemen." *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86-87 (D.D.C. 2017).

The second approach multiplies the total compensatory damages award by a factor between one and five, with a multiplier of three being typical when there are no exceptional circumstances in a case. *See, Fuld*, at 38 (citing *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 73 (D.D.C. 2015) and *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017)). Furthermore, Courts have held that this approach, which typically results in much lower punitive damages, is "especially appropriate when the defendants "did not directly carry out the attack but funded [a proxy actor] …" *Id*. at 39 (citing *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 1, 26 (D.D.C. 2016)).

The third approach, often applied in cases of extrajudicial killing, employs a fixed amount of $150 million USD ($150,000,000) per decedent, or per family. *See Warmbier v. Democratic Republic of Korea,* 365 F. Supp. 3d at 59-60. See also, Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d at 54 (holding that a bombing materially supported by Syria was deserving of the $150 million in punitive damages for each victim.) *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008), see also Estate of Hirshfeld v. Islamic Republic of Iran, 330 F. Supp. 3d 107, 149 (D.D.C. 2017) (finding that an award of $150,000,000 was appropriate where Iran provided material support to Hamas for an attack perpetrated against unarmed students at their school in Israel). *See also*, *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105-106 (D.D.C. 2008). (Holding that Plaintiffs were entitled to the $150,000,000 in punitive damages per decedent as for a bus bombing that the court determined to be "extremely heinous", and "inflicted maximum pain and suffering on innocent people"). See *also, Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 164 (D.D.C. 2019) ("Typically, an award consists of $150 million per decedent")). Other cases have warranted different approaches to determining punitive damages, but Plaintiff believes the facts of this case lend best to the standard amount established in previous cases.[19]

In this case, each of these factors weighs in favor of the standard punitive damages award for extrajudicial killing under FSIA jurisprudence, amounting to **$150,000,000 USD**.[20]

---

A third approach awards a fixed amount of $150,000,000 per affected family. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (awarding $300,000,000 in total to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150,000,000 each to families of three deceased victims); *Gates*, 580 F. Supp. 2d at 75 (awarding $150,000,000 each to the estates of two victims)." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 59-60 (D.D.C. 2018).

[20] In FSIA cases, "foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards." *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012).

Firstly, in orchestrating the terrorist attack on Koya, Iraq that killed Mr. Mahmoudzadeh, Iran has behaved in an outrageous and vile manner. The action was a violation of Iraqi sovereignty, international law, and constitutes an international act of terrorism targeting volunteer and refugee civilians. Furthermore, this terrorist attack must be considered within the broader context of the Iranian missile and drone program, which poses a grave threat to peace and stability not only in the Middle East, but globally, and to the United States itself who lost its citizens in multiple drone attacks as late as January of 2024[21]. Iran must be punished for this flagrant attack on innocent civilians on the sovereign territory of another state. Furthermore, Iran, as a sovereign nation, has a vast wealth of economic resources as a resource-rich country. Their missile and drone exports have been as profitable as they are dangerous, and punitive damages should therefore be commensurate with the threat it poses, to have the intended deterrent effect. And on the facts of the case, where Iran's terrorist attack on Koya, Iraq amounted to the extrajudicial killing of Mr. Omer Mahmoudzadeh, the standard FSIA punitive damages award of $150,000,000 USD is appropriate. *See*, *Colvin v. Syrian Arab Republic*, 363 F. Supp. at 164. In alternative, we asked for 5X of the Compensatory damages awarded to the Plaintiffs.

### IV.    Conclusion

Plaintiffs respectfully request that this Court enter a default final judgment in their favor against Defendants. This Court has personal jurisdiction over Defendants, as well as subject matter jurisdiction over the claims in this action. Defendants, despite being provided an offer to

---

[21] "Three U.S. soldiers were killed yesterday in Jordan, while more than 40 other service members were injured following an uncrewed aerial system attack at a military base near the Syrian border. Those service members were in Jordan to support Operation Inherent Resolve, which is the U.S. and coalition mission to ensure the defeat of ISIS." US. Department of Defense. ( https://www.defense.gov/News/News-Stories/Article/Article/3659809/3-us-service-members-killed-others-injured-in-jordan-following-drone-attack/  last visited August 9, 2024)

arbitrate, notice, and an opportunity to be heard, have declined to defend this action. The Defendants' silence says volumes about their culpability. Plaintiffs' damages are compelling and significant. The facts before the Court demonstrate that Plaintiffs are fully entitled to the recovery of sizeable monetary damages for Defendant's outrageous behavior and that the need for deterrence is paramount.

Accordingly, Plaintiffs requests that this Court award the following monetary damages:

1) **NON-ECONOMIC DAMAGES:**
   a) SHIWA NAHADI, wife of Decedent:
      i) **$11,945,000.00** including $10,000,000 USD + Prejudgment interest
   b) TARA MAHMOUDZADEH, daughter of Decedent:
      i) **$7,465,625.00** including $6,250,000, plus Pre-judgement interest
   c) ESTATE OF OMER MAHMOUDZADEH
      i) **$1,000,000.00**
2) **PUNITIVE DAMAGES:**
   a) **$150,000,000 USD**
3) **TOTAL DAMAGES:**
   a) **$170,410,625.00 USD**


Respectfully submitted,

        */s/ Ali Herischi*
Ali Herischi, Esq.
MD0024
Herischi Human Rights Law Center
11300 Rockville Pike, Ste 712
North Bethesda, MD 20852
ali.herischi@ibhlaw.com
Tel.: 301.363.4540
Fax: 301.363.4538

*Counsel for Plaintiff*