UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHIWA NAHADI, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*<br><br>Defendants. | Civil Action No. 23-cv-601 |

MEMORANDUM OPINION

On March 6, 2023, Plaintiffs Shiwa Nahadi, Tara Mahmoudzadeh, and the Estate of Omer Mahmoudzadeh filed this suit under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1605, against Defendants Islamic Republic of Iran ("Iran") and the Islamic Revolutionary Guard Corps ("IRGC"). Compl. ¶¶ 25–33, ECF No. 1 ("Compl."). Plaintiffs allege that Omer Mahmoudzadeh's death on September 28, 2022, was an extrajudicial killing by Defendants, who launched 70 ballistic missiles and drones into Kurdish refugee camps in Koya, Iraq. *Id.* ¶¶ 10, 15, 18.

On October 24, 2023, Plaintiffs served Defendants. ECF No. 9. When Defendants failed to respond to the Complaint within 60 days, Plaintiffs then moved to enter a default judgment. ECF No. 10; 28 U.S.C. § 1608. The Clerk of the Court entered the default on March 11, 2024. ECF No. 11; Fed R. Civ. Pro. 55 (a).

On August 12, 2024, Plaintiffs moved for default judgment against Iran, requesting that the court find Defendants liable for the extrajudicial killing of Omer Mahmoudzadeh, and award Plaintiffs' pain and suffering, loss of solatium and intentional infliction of emotional distress damages, prejudgment interest, and punitive damages. Pls.' Mot. for Default J. at 1–44, ECF No.

12 ("Pls.' Mot."). For the reasons below, the court will GRANT IN PART and DENY IN PART Plaintiffs' Motion.

## I.     FINDINGS OF FACT

Before this court can enter default judgment against Defendants, it must "reach [its] own, independent findings of fact," notwithstanding prior cases implicating the same issues. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). "[N]umerous evidentiary sources" can support a default judgment. *Id.* at 171. The plaintiffs here submitted evidence— personal declarations, experts declarations and reports, as well as public statements and articles. Based on the undisputed evidence before it, the court finds the following facts.

Plaintiffs are United States citizens. Ex. 5, Shiwa Nahadi Naturalization Certificate, at 1, ECF No. 12-5 ("Ex. 5"); Ex. 8, Tara Mahmoudzadeh Birth Certificate, at 1, ECF No. 12-8 ("Ex. 8"); Ex. 10, Omer Mahmoudzadeh Death Certificate, at 1, ECF No. 12-10 ("Ex. 10"). Omer Mahmoudzadeh was a U.S. citizen at the time of his death, Shiwa Nahadi has been a naturalized citizen since 2008, and Tara Mahmoudzadeh was born in Viriginia in 2002. Ex. 5 at 1; Ex. 8 at 1; Ex. 10 at 1. Plaintiffs Shiwa Nahadi and Tara Mahmoudzadeh were not present at the Koya attack but are the wife and daughter of Omer Mahmoudzadeh, respectively. Decl. of Shiwa Nahadi ¶¶ 1, 6, ECF No. 12-2 ("Shiwa Nahadi Decl."); Decl. of Tara Mahmoudzadeh ¶¶ 1–2, ECF No. 12-3 ("Tara Mahmoudzadeh Decl."). Defendant Iran has been designated a State Sponsor of Terrorism since January 19, 1984. Ex. 43, State Sponsors of Terrorism Designation List, at 2, ECF No. 12-42 ("Ex. 43"); *see also Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 114 (D.D.C. 2012) (recognizing long-held state sponsor of terrorism recognition).

On September 28, 2022, Defendants launched 70 ballistic missiles and dozens of drones at Kurdish refugee camps in Koya, Iraq. Decl. of Karim Farkhapur, Director of the Administration Secretariat, Kurdistan Democratic Party of Iran ¶ 11, ECF No. 12-4 ("Farkhapur Decl."). The

attack injured at least 20 school children, *id.* ¶ 13, and killed 13 people, including Omer Mahmoudzadeh, who was near the targeted Kurdish headquarters when the bombing started. *Id.* ¶ 11. Several survivors testified that he ran into the headquarters area during the attack, where he and several other people were killed or injured. *Id.* That same day, the Iraqi regime confirmed that IRGC launched the attack. *Id.* ¶ 15. The United States issued public statements condemning the attack. Ex. 19, Nat'l Security Advisor Stmt. on Iran's Missile and Drone Attacks in Northern Iraq, at 1–2, ECF No. 12-19 ("Ex. 19"); Ex. 20, U.S. Dep't of State Stmt., at 1, ECF No. 12-20 ("Ex. 20"). Two days later, the Iranian government "confirmed their involvement and publicly broadcasted their attack" on Kurdish-Iranian refugee camps. Farkhapur Decl. ¶ 16.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) gives a district court the discretion to enter a default judgment upon a party's motion, but "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). "[S]trong policies favor resolution of disputes on their merits," and therefore "default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotations and citation omitted).

In addition, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject matter jurisdiction over the action," *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 79 (D.D.C. 2017) (quoting *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)), and "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. The party seeking default judgment has the burden of establishing both subject matter and personal jurisdiction. *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008).

To obtain a default judgment against a defendant under the FSIA, a plaintiff must establish

their claim "by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  Thus, the court "may not

unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic

of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), but "[u]ncontroverted factual allegations that are

supported by admissible evidence are taken as true," *Thuneibat v. Syrian Arab Republic*, 167 F.

Supp. 3d 22, 33 (D.D.C. 2016).

### III.  CONCLUSIONS OF LAW

#### A.  Subject Matter and Personal Jurisdiction

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United

States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002).  It

grants U.S. district courts original jurisdiction, regardless of the amount in controversy, over any

(1) "nonjury civil action" (2) "against a foreign state" for (3) "any claim for relief in personam,"

so long as the state is (4) "not entitled to immunity." 28 U.S.C. § 1330(a).  Each factor is met here.

##### i.  Non-Jury Civil Action

Plaintiffs did not seek a jury trial here, Compl. ¶¶ 1–49; they sued under the FSIA, and

Congress does not provide plaintiffs with a right to a jury trial "under the Seventh Amendment."

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010).

##### ii.  Foreign States

Both Defendants—Iran and IRGC—are foreign states.  The definition of foreign state

encompasses both a "political subdivision of a foreign state" and any "agency or instrumentality

of a foreign state." 28 U.S.C. § 1603(a).  An agency or instrumentality of a foreign state is defined

as an entity

> "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of
> a foreign state or political subdivision thereof, or a majority of whose shares or other
> ownership interest is owned by a foreign state or political subdivision thereof, and (3)

which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." *Id.* §§ 1603(a)–(b).

Under these definitions, if an entity "'is an integral part of a foreign state's political structure'" "that defendant is treated as a foreign state for FSIA purposes." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 79 (D.D.C. 2010) (quoting *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005)). Iran is a foreign state, and IRGC also qualifies because it is a "parallel military institution to Iran's regular armed forces, plays a major unofficial role in Iran's economy, and is responsible for regime security." Ex. 37, Iran: Background and U.S. Policy, at 4, ECF No. 12-37 ("Ex. 37").

### iii.    Immunity

Defendants are not entitled to immunity.[1] FSIA's terrorism exception provides that foreign states shall not be immune in cases in which: (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Factor one is met because Plaintiffs seek only monetary damages. *See* Compl. ¶¶ 39, 46. Factor two is met because, as explained above, both Iran and IRGC are foreign states. *Infra* Section III.A.ii. Factor three is met because Omer Mahmoudzadeh died. Ex. 10 at 1. Factor four is met because both Defendants claimed responsibility for the drones and missiles launched from Iran that landed in Koya, Iraq, killing Omer Mahmoudzadeh. Farkhapur Decl. ¶¶ 11, 16; Ex. 37 at 2. The final factor is met because

---

[1] To establish personal jurisdiction, the court must first have subject matter jurisdiction. 28 U.S.C. § 1330(b) (a requirement of personal jurisdiction is that the court also have "jurisdiction under subsection (a)"). The court therefore discusses whether Defendants are immune under the FSIA before discussing whether the court has personal jurisdiction. *Id.* § 1330(a) (placing the "in personam" factor before the FSIA "immunity" factor).

Omer Mahmoudzadeh's death did not result from an "authorized" killing "by a previous judgment pronounced by a regularly constituted court," and thus was an extrajudicial killing.  28 U.S.C. § 1605A(h)(7); Ex. 10 at 1; Ex. 13 at 1, ECF No. 12-13 ("Ex. 13") (picture of Mahmoudzadeh released by IRGC as one of those killed); Farkhapur Decl. ¶¶ 11, 16.  The court therefore concludes that Defendants' material support for the extrajudicial killing of Omer Mahmoudzadeh proximately caused Plaintiffs' injuries, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1).

### iv.    Personal Jurisdiction

Under the FSIA, a court may exercise personal jurisdiction over a foreign state if it has subject matter jurisdiction, and service of process is properly effectuated under 28 U.S.C. § 1330(b) and 28 U.S.C. § 1608(a).  *See GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012); *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018).  "In other words, under the FSIA, subject matter jurisdiction plus service of process equals jurisdiction."  *GSS Grp. Ltd.*, 680 F.3d at 811 (internal quotation marks and citation omitted).  Having already concluded that this court has subject matter jurisdiction, the court will examine whether Plaintiffs properly served Defendants.

The FSIA provides four methods for serving a foreign state.  *See* 28 U.S.C. § 1608(a).  First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."  *Id.* § 1608(a)(1).  If service cannot be made under such an arrangement, then it may be made "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2).  If the plaintiff cannot serve the defendant via the first two methods, then it must attempt to effect service

"by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3).  If, after 30 days, service cannot be effectuated by this third option, the plaintiff may attempt service through diplomatic means.  To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint, and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4).  The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Plaintiffs first attempted service under Section 1608(a)(1) or 1608(a)(2) on March 7, 2023, when they requested electronic issuance of the summons and complaint to the Ministry of Foreign Affairs in Iran.  Mar. 7, 2023 Summons, ECF No. 2.  When that proved unsuccessful, on April 20, 2023, Plaintiffs attempted service under Section 1608 (a)(3), by requesting that the Clerk mail a copy of the summons, complaint, notice of suite, and translation of each.  Apr. 19, 2023 Aff. Requesting Foreign Mailing Pursuant to 28 U.S.C. § 1608(a)(3), ECF No. 3.  When Plaintiffs did not effect service within 30 days, they then attempted service under Section 1608(a)(4) on August 8, 2023.  Aug. 8, 2023 Aff. Requesting Foreign Mailing Pursuant to 28 U.S.C. § 1608(a)(4), ECF No. 6.  On October 24, 2023, Defendants received proper diplomatic service of Plaintiffs' Complaint.  Nov. 27, 2023 Return of Service Aff., ECF No. 9.  Thus, this court has personal jurisdiction, as well as subject matter jurisdiction.

### B.  Liability

Because the court has jurisdiction over their claims under Section 1605A(a)(1), Plaintiffs have also established the essential elements for imposing liability under Section 1605A(c), which provides a private right of action under the FSIA "for personal injury or death caused by acts" described in Section 1605A(a)(1).  This is because Section 1605A(c) expressly incorporates the elements necessary to waive a foreign state's immunity, meaning that liability under Section 1605A(c) exists whenever the jurisdictional requirements of Section 1605A(a)(1) are met.  *See Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) ("Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action.").

### C.  Damages

Damages available under Section 1605A's cause of action "include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).  Accordingly, deceased victims' estates can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages.  *Valore*, 700 F. Supp. 2d at 83.  The estate of a deceased victim may also recover damages for pain and suffering if it can be proved that the decedent experienced pain and suffering before their death.  *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000).  Finally, in appropriate cases, plaintiffs may recover prejudgment interest on their compensatory damage awards.  *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 53–54, No. 08-1361, 2014 WL 3687126, at *7 (D.D.C. July 25, 2014).

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more

likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)).

### v.        Pain and Suffering

Plaintiffs request that the Estate of Mahmoudzadeh be awarded $1 million in damages for pain and suffering, or, in the alternative, $750 thousand for "the fear he experienced prior to this death" if the court is unpersuaded by the "chaotic nature of the attack." Pls.' Mot. at 21. The court will award the former.

Assessing appropriate damages for pain and suffering considers a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal citation and quotation marks omitted). Damages for pain and suffering cannot be awarded if death was instantaneous. *Elahi*, 124 F. Supp. 2d at 112. In addition, a court will not award damages for pain and suffering if the plaintiff cannot prove that the decedent consciously experienced the time between an attack and their death. *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 244 (D.D.C. 2012).

The court is persuaded that Omer Mahmoudzadeh was alive for an appreciable period of time after his injury, experiencing pain and suffering before aid could reach him, although it is unclear how long he suffered. No one was allowed back inside the Iraqi refugee camp until hours after the attack ended. Farkhapur Decl. ¶ 10. But Plaintiffs offer several pieces of evidence indicating that Mahmoudzadeh's death was not instantaneous. His official cause of death issued

by the U.S. Department of State was "[s]kull laceration with amputation of both legs due to explosion." Ex. 10 at 1. The leading cause of death resulting from instances of traumatic amputation from explosives is hemorrhage. Ex. 36, "Traumatic amputations," at 67–72, 78, ECF No. 12-36 ("Ex. 36"). Such death can take hours, depending on the extent of the injury, the location of the injury, and the condition of the victim. *Id*. An eyewitness present at the refugee camp stated that he heard someone screaming in pain *after* the explosion, whose body he later identified as Omer Mahmoudzadeh, Farkhapur Decl. ¶ 10, indicating that Mahmoudzadeh's death was unlikely instantaneous.

Inconclusive evidence of survival for a brief time after an attack is not a bar to pain and suffering damages. For example, in *Elahi*, 124 F. Supp. 2d at 133, another court in this district concluded that because the decedent had flesh under his fingernails, he was alive "long enough to grab hold and scratch his assailant" and thus pain and suffering of $1 million was appropriate. In *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 145 (D.D.C. 2018), another court concluded that although no testimony clarified "exactly when" the decedent died, because he was running at the time he was shot, that was sufficient to award his estate $1 million in pain and suffering damages. So too here, because both medical evidence and eyewitness testimony suggest that Mahmoudzadeh suffered a brief period of time after he was injured by Defendants' attacks, pain and suffering damages are appropriate.

Accordingly, the court will award Plaintiffs' requested pain and suffering damages of $1 million.

### vi.    Solatium and Intentional Infliction of Emotional Distress

Plaintiffs request $16.25 million in damages for solatium and intentional infliction of emotional distress ("IIED")—$10 million for Shiwa Nahadi and $6.25 million for Tara

Mahmoudzadeh.  Pls.' Mot. at 28.  In the alternative, they request $13 million for the "baseline recovery as direct family members of the decedent."  *Id.*

"Solatium under the FSIA is functionally identical to [intentional infliction of emotional distress]."  *Roth v. Syrian Arab Republic*, No. 1:14-0194, 2018 WL 4680270, at *15 (D.D.C. Sept. 28, 2018).  It is a form of damages intended to compensate persons for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent['s] society and comfort."  *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal citation and quotation marks omitted).  Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998) (discussing solatium damages under the prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity).

Another district court in this Circuit developed a standardized approach for evaluating IIED claims for solatium damages in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006), in which it surveyed past awards to family members of victims of terrorism to determine that, based on averages, "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings."  Courts typically award damages for a victim's spouse of between $8 and $12 million, and $5 million dollars for a victim's child.  *Id.*  In applying the *Heiser* framework, however, courts should bear in mind that deviations may be warranted when, for example, "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf

of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

The decedent's family members—Shiwa and Tara—in this case present compelling evidence about their relationships to Omer Mahmoudzadeh and their emotional state since his death. Mahmoudzadeh's death, and the manner in which it occurred, have wrought profound harm to his wife and daughter—emotional, physical, and financial. His wife explains that since her husband's death, she has "experienced insomnia, elevated blood pressure, hair loss, increased cholesterol, bacterial issues in my stomach, and a weakened immune system." Shiwa Nahadi Decl. ¶ 13. Her doctor told her that she has a "heightened risk of cancer" "due to the severe stress endured over the past year and a half." *Id.* She nonetheless maintains two jobs while managing her health issues. *Id.* ¶ 14. His daughter fares no better than her mother. She describes having "trauma and anxiety" that keeps her "awake at nights," because of "the flashbacks and visualizations of" her father's death. Decl. of Tara Mahmoudzadeh Decl. ¶ 11. She "barely" has "enough energy to pull" herself together for work. *Id.* After work, she "goes straight back home, exhausted by keeping [her] mental health in an acceptable condition while at work." *Id.* Accordingly, the court finds that Plaintiffs Shiwa and Tara should be awarded at least the baseline amount of solatium and IIED damages—$8 million and $5 million, respectively. *Heiser*, 466 F. Supp. 2d at 269.

### a.  Upward Departure of 25%

Shiwa and Tara request a 25 percent increase from the baseline amount. Pls.' Mot. at 28. The court may award greater amounts in cases "with aggravating circumstances," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006), indicated by "[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence" or

"[m]edical treatment for depression and related affective disorders," *Flatow*, 999 F. Supp. at 31.

Such departures are usually relatively small, absent "circumstances that appreciably worsen" a

claimant's "pain and suffering, such as cases involving torture or kidnapping" of the party to whom

extreme and outrageous conduct was directed. *Greenbaum*, 451 F. Supp. 2d at 108 (granting an

upward departure of a widower's award from $8 million to $9 million upon consideration of "the

severity of his pain and suffering due to the loss of his wife and unborn first child").

The court finds that, based on the record, only Shiwa Nahadi warrants a 25 percent increase.

Shiwa has had multiple medical issues and is Omer Mahmoudzadeh's widow.  Her acute medical

issues, including a risk of cancer, while managing two jobs, suggests ongoing, chronic harm.

Nahadi Decl. ¶¶ 13–14; *see also Valore*, 700 F. Supp. 2d at 86 (finding that a 25 percent increase

from the baseline solatium and IIED damage amount was appropriate when a plaintiff

demonstrated ongoing, severe health issues).  Mahmoudzadeh's daughter, Tara, does not establish

enough to warrant the same.  Her medical issues, while significant, have never resulted in a

hospitalization and are not necessarily chronic conditions.  Tara Decl. ¶ 11.

Accordingly, the court will award $10 million for Plaintiff Shiwa Nahadi and $5 million

for Tara Mahmoudzadeh in solatium and IIED damages.

### vii.    Prejudgment Interest

Plaintiffs also request prejudgment interest, by multiplying their pain and suffering

damages by 1.19451448.  Pls.' Mot. at 30.  They argue that interest is warranted because Omer

Mahmoudzadeh was a humanitarian aid volunteer and thus had no lost wages to warrant economic

damages. *Id.* at 28–29.  The court disagrees.

"The decision to award prejudgment interest, as well as how to compute that interest, rests

within the discretion of the court, subject to equitable considerations." *Baker v. Socialist People's*

*Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011). "The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). Accordingly, "[p]rejudgment interest is an element of complete compensation." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012) (quoting *West Virginia v. United States*, 479 U.S. 305, 311–12 (1987)). Some judges in this district have found that because awards for pain and suffering and solatium are "designed to be fully compensatory," prejudgment interest "is not appropriate and will be denied." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 404 (D.D.C. 2015); *Thuneibat*, 167 F. Supp. 3d at 54. Other judges have found, however, that prejudgment interest is appropriate "where plaintiffs were delayed in recovering compensation for their injuries— including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008); *see also Est. of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013); *see also Baker*, 775 F. Supp. 2d at 86; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009).

The court concludes that prejudgment interest is inappropriate in this case. While Plaintiffs have waited since March 11, 2024, for relief given Defendants' inaction in this case, they have not offered evidence that Omer Mahmoudzadeh was the target of Defendants' attack. Plaintiffs argue that the "attack on September 28, 2022, is not the first time the IRGC has targeted the [Kurdish] community in Koya, Iraq." Pls.' Mot. at 31. "In 2018 the Iranian regime orchestrated a missile attack against the [Kurdish] headquarters and its refugee camps, which killed 16 people." *Id.* Even so, there is nothing in the record indicating that Defendants meant to target the Kurdish

headquarters, much less Omer Mahmoudzadeh himself in this specific attack.  Accordingly, the

court will not award prejudgment interest.

    **viii.**    **Punitive Damages**

       Plaintiffs request $150 million in punitive damages, or five times the amount of

compensatory damages.  *Id.* at 42–43.  The court will award the former.

       "Punitive damages are not meant to compensate the victim, but [are] meant to award the

victim an amount of money that will punish outrageous behavior and deter such outrageous

conduct in the future."  *Oveissi*, 879 F. Supp. 2d at 56.  In assessing whether to award punitive

damages, some courts rely on the Restatement (Second) of Torts, which recommends punitive

damages in cases involving "outrageous conduct."  *Sutherland v. Islamic Republic of Iran*, 151 F.

Supp. 2d 27, 52–53 (D.D.C. June 25, 2001) (citing the Restatement (Second) of Torts § 908(1)

(1965)).  Most courts in this Circuit have found that punitive damages are warranted in FSIA cases

because terrorist acts are deemed outrageous.  *See, e.g.,* *Moradi v. Islamic Republic of Iran*, 77 F.

Supp. 3d 57, 69 (D.D.C. 2015).[2]

       Courts in this Circuit often consider four factors to determine whether punitive damages

are appropriate: "(1) the character of the defendants' act, (2) the nature and extent of harm to the

plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the

wealth of the defendants."  *See Oveissi*, 879 F. Supp. 2d at 56 (internal quotation marks and citation

omitted); *Sutherland*, 151 F. Supp. 2d at 53.  All four factors weigh in favor of awarding punitive

damages in this case.  First, Defendants' actions in launching ballistic missiles and suicide drones

---

[2] *See also Khosravi v. Islamic Republic of Iran*, No. 16-cv-02066, 2020 WL 4923495, at \*6
(D.D.C. Aug. 21, 2020); *Sutherland*, 151 F. Supp. 2d at 52–53; *Bernhardt v. Islamic Republic
of Iran*, No. 18-cv-2739, 2023 WL 2598677, at \*17 (D.D.C. Mar. 22, 2023); *Selig v. Islamic
Republic of Iran*, 573 F. Supp. 3d 40, 75 (D.D.C. 2021).

at refugee camps was a horrific act of terrorism.  Farkhapur Decl. ¶ 10.  Second, Omer

Mahmoudzadeh's death and the way in which he died caused his wife and daughter enormous

grief.  Shiws Nahadi Decl. ¶ 13; Tara Mahmoudzadeh Decl. ¶ 11.  Third, "[t]he need to deter this

behavior is high, as Iran continues a pattern of torture." *Panahi v. Islamic Republic of Iran*, No.

19-cv-0006, 2020 WL 6591425, at *11 (D.D.C. Nov. 10, 2020).  Finally, "Iran is a sovereign and

has substantial wealth." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

"[S]everal approaches have been articulated for calculation of the appropriate amount of

punitive damages in state-sponsored terrorism cases." *Warmbier v. Democratic People's Republic*

*of Korea*, 356 F. Supp. 3d 30, 59 (D.D.C. 2018).  The first two methods calculate punitive damages

by (1) multiplying a number between three and five by the foreign sovereign's annual funding for

terrorist activities (referred to as "the annual expenditure"); or (2) multiplying the compensatory

damages award by a number between one and five.  *See Bernhardt*, 2023 WL 2598677, at *18.

The third method calculates punitive damages as equal to the amount of compensatory damages

awarded.  *See Selig*, 573 F. Supp. 3d at 77.  The final method involves awarding a flat sum of

$150,000,000 to each afflicted family member.  *See Bernhardt*, 2023 WL at 2598677, at *18.

Plaintiffs argue that the flat sum of $150 million should be awarded to them in total, not to

each family member.  Pls.' Mot. at 42.  Awarding such per decedent or family is usually reserved

for "the most repugnant and premeditated attacks."  *Bernhardt*, 2023 WL 2598677, at *18

(explaining the various approaches for punitive damages); *Gates v. Syrian Arab Republic*, 580 F.

Supp. 2d 53, 75 (D.D.C. 2008) (omitted subsequent history) (finding that the recording,

publication, and distribution of video footage of the torture and murder of two civilian contractors

"glorified cruelty and fanned the flames of hatred," warranting an award of $150 million in

punitive damages per family).  The court agrees.  Defendants' attack killed 13 people and injured

20 schoolchildren.  Farkhapur Decl. ¶¶ 11, 13.  Defendants broadcasted the event thereafter and claimed responsibility.  *Id.* ¶¶ 11, 16.  The attack used drones developed as part of Iran's robust drone program, which carries larger geo-political risks.  Ex. 56, "Iranian Drone Program," at 2, ECF No. 12-56.  Accordingly, punitive damages are appropriate here as a "forceful deterrent" against Iran. *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 273 (D.D.C. 2020); Pls.' Mot. at 35–39.

## IV.    CONCLUSION

For the above reasons, the court will GRANT IN PART and DENY IN PART Plaintiff's Motion for Default Judgment.  A corresponding order will follow.


Date: April 25, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge